UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | : CRIMINAL NO. 3:18cr 21 (JAM) |
| v. | : VIOLATION: |
| DIANE DALMY | : 18 U.S.C. § 371 (Conspiracy) |

FILED
2018 FEB -6  P 3:33
U.S. DISTRICT COURT
NEW HAVEN, CT.

INFORMATION

The United States Attorney charges that at all times relevant to this Information unless otherwise specified:

The Defendant

1. The defendant, DIANE DALMY, was a resident of Colorado and a securities lawyer who was licensed to practice law in Colorado. DALMY also served as an adjunct professor at the University of Colorado – Denver Business School, where she taught courses on business law and ethics.

The Defendant's IOLTA

2. An Interest on Lawyer Trust Account (also known as an "IOLTA") was a type of pooled trust account used by attorneys to hold funds belonging to clients or third parties that were nominal in amount or expected to be held for a short period of time.

3. DALMY maintained an IOLTA, with an account number ending in 6485, at U.S. Bank in Colorado.

Other Relevant Persons and Entities

4. William Lieberman, who has been charged separately, was a resident of New York until in or about December 2014, when he moved to Florida.

1

5. Christian Meissenn, who has been charged separately, was a resident of Connecticut.

6. Corey Brinson, who has been charged separately, was a lawyer who was licensed to practice law in Connecticut. Brinson maintained an IOLTA, with an account number ending in 5573, at People's United Bank in Connecticut.

7. Co-Conspirator 1, who has not been charged, was a resident of New York.

8. Broker 1, who has not been charged, was a broker who, for a commission, facilitated the purchase and sale of public companies (also known as "issuing companies" or "issuers"). Broker 1 was a resident of New York.

9. Attorney 1, who has not been charged, was, like DALMY, a lawyer who was licensed to practice law in Colorado.

10. Mammoth Energy Group, Inc. (referred to in this Information as "Mammoth") was a public company that was incorporated in Nevada on or about February 27, 2006. Mammoth traded under the stock symbol MMTE. On or about March 5, 2013, Mammoth reincorporated in Wyoming. On or about November 12, 2014, Mammoth amended its articles of incorporation to change the company's name to Strategic Asset Leasing, Inc. (referred to in this Information as "Lease") and thereafter traded under the stock symbol LEAS.

11. Fox Petroleum, Inc. (referred to in this Information as "Fox") was a public company that was incorporated in Nevada on or about February 4, 2004. Fox traded under the stock symbol FXPT.

12. Queen Asia Pacific Ltd. (referred to in this Information as "Queen Asia") was a private company that was incorporated in Nevada on or about February 11, 2015.

### Restricted and Control Securities

13. The United States Securities and Exchange Commission (referred to in this Information as the "SEC") was an independent agency of the executive branch of the United States government. The SEC was responsible for enforcing federal securities laws and promulgating rules and regulations in keeping with the same.

14. In general, securities issued by public companies had to be registered with the SEC in order to be sold to the investing public. If such securities were not registered, they generally were considered "restricted" and could not be freely transferred. However, Title 17, Code of Federal Regulations, Section 230.144 (also known as "Rule 144"), permitted the public resale of restricted securities in certain circumstances. The requirements for relying on Rule 144 included that the seller of the securities had to hold them for a specified period of time before the proposed sale (either six or twelve months), and that adequate current information about the issuer had to be publicly available.

15. "Control securities" were securities held by an "affiliate" of the issuer. An "affiliate" of an issuing company was a person or entity that directly or indirectly controlled, was controlled by, or was under common control with the issuing company. "Control" meant the power to direct or cause the direction of the management and policies of the issuing company. Rule 144 imposed heightened requirements on an affiliate of an issuing company who wished to resell securities acquired from the

company. These included the obligation to notify the SEC of the proposed sale in certain circumstances.

16. Moreover, an investor (whether or not an affiliate) could not rely on Rule 144 to resell securities issued by a "shell company," meaning a company that had (a) no or nominal operations, *and* (b) either no or nominal assets, assets consisting solely of cash and cash equivalents, or assets consisting of any amount of cash and cash equivalents with nominal other assets.

17. Stock certificates for restricted securities were required to be stamped with the word "restricted." This stamp (also known as a "legend") disclosed, among other things, that the shares were not registered with the SEC and could not be publicly sold. Such a stamp could be removed only by a "transfer agent," which was a third-party company assigned by the issuer to maintain records of investors. In order to remove a "restricted" legend, and make the shares "free-trading" such that they could be freely transferred, a transfer agent generally required an "opinion letter" from the issuer's counsel stating that the legend could be removed because the transaction either complied with, or was not subject to, the provisions of Rule 144.

### Different Types of Opinion Letters

18. As described in the preceding paragraph, an "opinion letter" could mean a letter written by an attorney to a transfer agent for the purpose of unrestricting securities so they could be freely traded.

19. In addition, an issuing company also could request that its counsel write a different type of opinion letter in connection with certain public filings made by the company, such as annual and quarterly investor reports. This type of letter typically

4

stated that, after appropriate investigation by the attorney, it was the attorney's opinion that adequate current information about the issuer was publicly available for investors to review. This type of opinion letter was relied upon by investors in making their discretionary investment decisions.

### OTC Markets

20. OTC Markets Group Inc. (referred to in this Information as "OTC Markets") was an electronic securities market that provided price and liquidity information for over-the-counter securities that may not have met the reporting criteria for listing on national exchanges.

21. OTC Markets maintained a public website on which issuers whose securities were listed on OTC Markets could post information for investors to review. This information could include annual and quarterly investor reports accompanied by attorney opinion letters.

22. On or about June 24, 2009, OTC Markets barred DALMY from submitting opinion letters for posting on OTC Markets' website.

### NOBO Lists

23. A Non-Objecting Beneficial Owners (or "NOBO") list showed the beneficial shareholders of an issuing company who did not object to the company knowing their names, addresses, and share amounts.

24. Broadridge Financial Services, Inc. (referred to in this Information as "Broadridge") was a financial technology firm that maintained NOBO lists on behalf of issuers. A NOBO list could be obtained from Broadridge by an officer or director of the requesting issuer or by the issuer's counsel.

## COUNT ONE
## (Conspiracy to Commit Wire Fraud)

25.  Paragraphs 1-24 of this Information are realleged and incorporated as though set forth fully herein.

### The Wire Fraud Conspiracy

26.  From in or about January 2009 through in or about July 2016, the exact dates unknown, in the District of Connecticut and elsewhere, DALMY knowingly did combine, conspire, confederate, and agree with others known and unknown to the United States Attorney to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

### Purpose of the Wire Fraud Conspiracy

27.  The purpose of the conspiracy was for DALMY and others known and unknown to the United States Attorney to enrich themselves by devising and participating in a scheme and artifice to defraud investors, and to obtain money from those investors by means of materially false and fraudulent pretenses, representations, and promises, and to use interstate wires in execution of that scheme.

### Manner and Means

The manner and means by which DALMY and her co-conspirators sought to accomplish and did accomplish the object and purpose of the conspiracy included the following:

28.  *Stock promotions.* DALMY's co-conspirators ran fraudulent stock promotions for various issuing companies under their control and the control of their

6

associates. In a typical promotion, DALMY's co-conspirators disseminated materially false, positive information about an issuer to investors through press releases, email marketing blasts, hardcopy mailers, and telephone solicitations, as well as by incorporating the misleading information into the issuer's public filings. After the hype led to artificially inflated share prices for the issuer's stock, DALMY's co-conspirators sold their own large positions in the stock at a profit. They would then end the promotion and allow the share price to plummet, leaving investors holding worthless and unsalable stock.

29. DALMY participated in this stock promotion aspect of the conspiracy by helping her co-conspirators to gain access to lists of investors who could be solicited during the fraudulent stock promotion campaigns.

30. For example, as described in the below sub-paragraphs, in or about May 2013, DALMY helped Lieberman to obtain a NOBO list for an issuing company that was a client of DALMY's law practice, so that Lieberman and Meissenn could use the list to identify and solicit prospective investors.

   a. On or about May 8, 2013, Lieberman requested that DALMY provide the issuing company's "CUSIP," meaning the alphanumeric code that identified the company's securities. After DALMY provided the CUSIP via email, Lieberman responded: "perfect this on downlow."

   b. On or about May 16, 2013, Lieberman completed and submitted to Broadridge a fraudulent NOBO request form for the issuing company, which incorporated the CUSIP provided by DALMY and on which

Lieberman had forged the signature of the issuer's president (*i.e.*, DALMY's client).

c.  On or about May 17, 2013, Lieberman emailed DALMY a copy of the NOBO request form containing the forged signature. Lieberman directed DALMY to contact Broadridge in her capacity as the issuer's attorney to confirm that the requested NOBO list would be delivered to DALMY's office and not to the issuer, so as not to alert the issuer to the fact that its NOBO list had been ordered from Broadridge.

d.  On or about May 23, 2013, Lieberman inquired whether DALMY had obtained a tracking number for the NOBO list. DALMY responded: "I will call [Broadridge] again today." Lieberman replied: "would appreciate – its worth a ton!" DALMY then wrote: "I called and this lady told me it was sent out. But I have not received. This is making me a bit nervous."

e.  Unbeknownst to DALMY and Lieberman, Broadridge attempted to confirm the NOBO list request by contacting the issuer's president, who reported to Broadridge that he had not submitted the request. As a result, the request was canceled. Thereafter, on or about June 3, 2013, Lieberman asked DALMY to introduce him to the issuer's president, so that Lieberman could attempt to obtain the NOBO list directly from the company. DALMY made the introduction via email the same day, describing Lieberman to the issuer's president as "the one who would like to discuss the nobo shareholder list with you."

  f. On or about June 7, 2013, Lieberman emailed DALMY that the issuer's president "sent us the . . . nobo with 16k names" and that Meissenn would "send you a wire next week for facilitating this." Lieberman added: "The more nobos we can acquire from other clients – the better. . . this is a very very good thing."

  g. On or about June 12, 2013, Meissenn arranged to have $1,500 wired from Brinson's IOLTA (in Connecticut) to DALMY's IOLTA (in Colorado).

  h. Thereafter, Lieberman and Meissenn used the NOBO list to identify and solicit investors during fraudulent stock promotion campaigns, including for Mammoth.

31. As another example, on or about August 27, 2013, DALMY introduced Lieberman and Meissenn to Broker 1 over dinner at a restaurant in New York, so that Broker 1 could participate in, and help to advance, the stock promotion scheme. During the dinner, Lieberman and Meissenn requested the assistance of DALMY and Broker 1 in obtaining investor lists to be used in promotions, and DALMY and Broker 1 agreed to provide that assistance. The next morning, Broker 1 emailed two NOBO lists to Lieberman (in New York), who forwarded the lists to Meissenn (in Connecticut). Thereafter, Lieberman and Meissenn used one or both of the lists to identify and solicit investors during fraudulent stock promotion campaigns, including for Mammoth.

32. *Opinion letters.* As described above, the defendants' co-conspirators monetized their scheme by having stock issued to themselves and their associates (or

9

by converting debt to stock), driving up the share prices via fraudulent promotions, and then selling their stock at the artificially inflated prices.

33. DALMY wrote, and permitted others to write in her name, fraudulent opinion letters that were used to unrestrict her co-conspirators' stock so that the stock could be freely traded on the open market. These letters were intended to, and did, permit DALMY's co-conspirators to sell their shares at times of their choosing, including to coincide with their fraudulent stock promotion campaigns, without concern for the time restrictions, notice requirements, and other provisions of Rule 144. DALMY's opinion letters were materially false in various respects, including as to whether the issuing company was a shell company, whether the shareholder was an affiliate of the issuer, whether the transactions described in the letters actually had occurred, and whether DALMY had performed the due diligence that she described in the letters.

    a. For example, on or about February 26, 2010, DALMY wrote an opinion letter to a transfer agent for the purpose of unrestricting 585,000,000 shares of stock issued by Mammoth, which at the time was controlled by Lieberman and Co-Conspirator 1. In the letter, DALMY falsely represented, among other things, that the recipient of the shares (*i.e.*, the shareholder) was not an affiliate of Mammoth and that Mammoth was not a shell company. In fact, as DALMY knew and understood, Mammoth and the shareholder were under the common control of Co-Conspirator 1, and hence they *were* affiliates. Moreover, DALMY knew and understood that Mammoth was a shell company.

DALMY charged Mammoth $400 for preparation of this fraudulent opinion letter.

b. As another example, on or about April 4, 2011, Lieberman emailed DALMY: "another opinion letter i wrote – i will have them send 500 bucks to you this week." Attached to the email was a completed opinion letter that Lieberman (who was not an attorney) wrote, signed in DALMY's name, and sent to a transfer agent for the purpose of unrestricting 3,500,000 shares of stock issued by Fox, which at the time also was controlled by Lieberman and Co-Conspirator 1 (like Mammoth). The letter falsely represented, among other things, that DALMY had performed the due diligence described in the letter. In fact, DALMY performed no due diligence in connection with this letter and was not even aware of the letter's existence until after it was submitted to the transfer agent by Lieberman.

c. As another example, on or about April 9, 2012, Lieberman emailed DALMY: "I have to do an issuance in [Mammoth] . . . . We ar emoving (sic) the assets out however I just did an opinion letter as i needed to do it ASAP. I will get you some sheckels, I promise! can you confirm that opinion is ok so i can send in?" Attached to the email was a completed opinion letter, written and signed by Lieberman in DALMY's name, and addressed to a transfer agent for the purpose of issuing 200,000,000 free-trading shares of Mammoth stock. The letter falsely represented, among other things, that the shareholder was not an

11

affiliate of Mammoth, that Mammoth was not a shell company, and that the issuance was in settlement of a two-year-old debt owed by Mammoth to the shareholder. In fact, as DALMY knew and understood, Mammoth and the shareholder were under the common control of Co-Conspirator 1, and hence they *were* affiliates. Moreover, DALMY knew and understood that Mammoth was a shell company, and that the aged debt purportedly owed by Mammoth to the shareholder was falsified by Lieberman in order to remove the transaction from the holding period imposed by Rule 144.

34. In addition, due at least in part to her bar by OTC Markets, DALMY ghost-wrote fraudulent opinion letters in Attorney 1's name (both of the type used to unrestrict stock and the type used in connection with public filings by issuers). In certain instances, DALMY wrote letters that Attorney 1 placed onto his letterhead and signed. In other instances, DALMY and Lieberman wrote opinion letters in Attorney 1's name without the knowledge and consent of Attorney 1. In all instances, the letters were materially false in various respects, including as to whether the issuing company was a shell company, whether the shareholder was an affiliate of the issuer, whether DALMY (or Attorney 1) had performed the due diligence described in the letters, and whether adequate current information about the issuer was publicly available for investors to review.

   a. For example, on or about August 16, 2010, DALMY emailed Attorney 1 (copying Lieberman) to request an opinion letter to accompany the posting on OTC Markets' public website of Mammoth's

quarterly report for the second quarter of 2010. In her initial email, DALMY suggested that Attorney 1 could simply work off the letter he posted from the prior quarter. DALMY then sent Attorney 1 a follow-up email: "I forgot that I actually prepared the [prior quarter's] opinion for you re Mammoth and then you placed on your letterhead. So, I will update re attachments so you don't need to incur the time involved to update opinion. I will then send to you for your signature and placement on your letterhead." The resulting opinion letter, which was written by DALMY, signed by Attorney 1, and posted to OTC Markets' website, contained the false representations that Mammoth was not a shell company, that adequate current information about Mammoth was publicly available for investors to review, and that Attorney 1 had conducted appropriate due diligence in connection with writing the letter.

b.      As another example, on or about November 10, 2010, DALMY and Lieberman requested that Attorney 1 sign an opinion letter written by DALMY and addressed to a transfer agent for the purpose of unrestricting 160,000 shares of stock issued by Fox. On or about November 11, 2010, Attorney 1 emailed a scanned copy of the signed letter to DALMY, who forwarded it to Lieberman. Unhappy with the quality of the scanned image, Lieberman wrote to DALMY: "does the guy not have a god damn printer?" DALMY responded: "He doesn't have a brain." On or about November 12, 2010, after Attorney 1 re-sent a

13

"professionally scanned" copy of the letter, Lieberman wrote to DALMY: "that's worse." In a subsequent email, Lieberman added: "i will fix it – watch. tell me if its fine." Lieberman copied the text of the letter into a new document, added Attorney 1's digital signature, and emailed the letter to DALMY, who responded: "Great job! Maybe we will just do that in the future with him. Any other attorney will charge well over $300 for opinion." Lieberman replied: "i have his signature. . . he wont even no." DALMY then wrote: "Perfect."

c. Ten days later, DALMY and Lieberman followed through on their plan to sign Attorney 1's name on fraudulent opinion letters. On or about November 22, 2010, Lieberman emailed DALMY that he required an opinion letter to accompany the posting on OTC Markets' website of Mammoth's third quarterly report for 2010. DALMY responded that she had been "trying to get to it," but that Lieberman could update the prior quarter's letter himself and "then put on [Attorney 1's] letterhead." Lieberman then wrote the letter himself on Attorney 1's letterhead and affixed Attorney 1's signature (without Attorney 1's knowledge and consent), emailed a copy of the letter to DALMY with the subject line "posting this," and posted the letter to OTC Markets' website. The letter contained the false representations that Mammoth was not a shell company, that adequate current information about Mammoth was publicly available for investors to review, and that Attorney 1 had

conducted appropriate due diligence in connection with writing the letter.

35. *Advancing client funds.* Another way in which DALMY participated in the conspiracy was by providing Lieberman and Meissenn with capital to fund their stock promotion scheme by advancing them money from her IOLTA that belonged to other clients of DALMY's law practice (without the knowledge and consent of those other clients), with the understanding that DALMY's co-conspirators would repay the advanced funds with the proceeds of the scheme.

    a. For example, on or about April 8, 2015, DALMY advanced $20,000 from her IOLTA to pay a stock promoter who was part of Lieberman's and Meissenn's network. The next day, DALMY received proceeds of the scheme from Lieberman to remedy the deficit.

    b. Similarly, on or about April 24, 2015, DALMY advanced $25,000 from her IOLTA to pay another stock promoter who was part of her co-conspirators' network. Three days later, DALMY received proceeds of the scheme from Lieberman to remedy the deficit.

36. *Concealment and Disposition of Proceeds.* As described above, DALMY's co-conspirators profited from their scheme by selling shares of stock whose value they had caused to become falsely inflated. DALMY and Lieberman used a private company, Queen Asia, to funnel the proceeds of the stock promotion scheme to Lieberman, Meissenn, and their network of promoters.

37. Lieberman incorporated Queen Asia on or about February 11, 2015. In order to conceal his involvement, Lieberman installed a nominee, who went by "Alan,"

as the company's sole officer. As a result, Lieberman's name did not appear on Queen Asia's corporate records.

38. On or about February 18, 2015, DALMY agreed to open a bank account for Queen Asia. The purpose of this account was to receive proceeds of the stock promotion scheme from a brokerage account in Queen Asia's name.

39. The next day, DALMY helped Lieberman to draft a board resolution appointing DALMY as Queen Asia's secretary, so that she could open the bank account. The resolution falsely described a teleconference between DALMY and Lieberman's nominee (but not Lieberman) on or about February 2, 2015, during which it was agreed that DALMY would become Queen Asia's secretary with authority to conduct banking transactions on the company's behalf. In fact, no such teleconference took place. On or about February 20, 2015, DALMY signed the fraudulent resolution, had it notarized, and emailed it to Lieberman, who used it to add DALMY as an authorized signatory on Queen Asia's bank account, with an account number ending in 3114, at Wells Fargo Bank. DALMY subsequently opened another bank account for Queen Asia, with an account number ending in 2507, at U.S. Bank.

40. At the direction of Lieberman (sometimes using an email address Lieberman set up in his nominee's name), DALMY periodically received into Queen Asia's bank accounts the proceeds of the stock promotion scheme, transferred those funds to her IOLTA, and then transferred the funds again to Lieberman and Meissenn and their network of stock promoters. As DALMY knew and understood, this two-step process helped to conceal that the funds derived from the stock

promotion scheme, as well as any connection between the source and recipients of the funds.

41.  DALMY was compensated by Lieberman for funneling money through Queen Asia's bank accounts and her IOLTA. For example, on or about February 26, 2015, DALMY received $24,000 in proceeds of the stock promotion scheme (resulting from the sale of 143,000 Lease shares) from Queen Asia's brokerage account into the company's bank account. The next day, Lieberman (emailing in his nominee's name) directed DALMY to transfer $23,500 to her IOLTA. On March 2, 2015, Lieberman (again emailing as "Alan") directed DALMY to wire $7,000 (from Colorado) to Meissenn (in Connecticut) and $10,000 to a stock promoter, adding: "Please keep 1500 dollars for yourself." DALMY sent the wires as directed.

42.  DALMY knew and understood that Lieberman was using a nominee to obscure his connection to Queen Asia, and in fact Lieberman explicitly informed DALMY that he did not want any documentary record of his control of Queen Asia through "Alan." For example, on or about May 2, 2016, DALMY sent an account statement to the email address Lieberman set up in his nominee's name. Later that day, DALMY sent a text message to Lieberman: "Hope you had a good wkend. Sent Alan the acct statement. About 12k in the hole." Lieberman responded: "Call u in a bit please don't text me that[.] I have asked you."

### Overt Acts

43.  In furtherance of the conspiracy and to achieve the object thereof, at least one of the co-conspirators committed or caused to be committed, in the District of Connecticut, and elsewhere, at least one of the following overt acts, among others:

44. On or about February 26, 2010, DALMY wrote and submitted to a transfer agent a fraudulent opinion letter for the purpose of unrestricting 585,000,000 shares of stock issued by Mammoth, in which letter DALMY falsely represented, among other things, that the recipient of the shares (*i.e.*, the shareholder) was not an affiliate of Mammoth and that Mammoth was not a shell company.

45. On or about November 22, 2010, with DALMY's assistance and encouragement, Lieberman wrote, signed in Attorney 1's name, and posted on OTC Markets' website a fraudulent opinion letter to accompany Mammoth's third quarterly report for 2010, which opinion contained the false representations that Mammoth was not a shell company, that adequate current information about Mammoth was publicly available for investors to review, and that Attorney 1 had conducted appropriate due diligence in connection with writing the letter.

46. On or about June 12, 2013, at Meissenn's instruction, Brinson wired $1,500 from his IOLTA to DALMY's IOLTA, which was DALMY's payment for helping Lieberman and Meissenn to obtain a NOBO list for us in their stock promotion scheme.

47. On or about August 27, 2013, Broker 1 emailed a NOBO list to Lieberman, who forwarded the list to Meissenn for use in identifying and soliciting investors in their stock promotion scheme, all as agreed upon between DALMY, Broker 1, Lieberman and Meissenn during dinner the previous evening.

48. On or about February 20, 2015, DALMY signed a fraudulent Queen Asia board resolution, had the resolution notarized, and emailed it to Lieberman, who used it to add DALMY as an authorized signatory on Queen Asia's bank account.

49. On or about March 2, 2015, DALMY wired $7,000 in proceeds of the stock promotion scheme from her IOLTA to Meissenn.

All in violation of Title 18, United States Code, Section 371.

UNITED STATES OF AMERICA

_____
JOHN H. DURHAM
UNITED STATES ATTORNEY

_____
AVI M. PERRY
ASSISTANT UNITED STATES ATTORNEY